1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,
                                        NO. CR. S-08-187 LKK
12          Plaintiff,

13      v.                                  O R D E R

14  MARK ANTHONY VALVERDE,

15          Defendant.
    _____/

16

17      Defendant appears before the court having been charged with

18  one felony count for Failure to Register as a Sex Offender, in

19  violation of 18 U.S.C. § 2250(a). He moves to dismiss the

20  indictment on several grounds, which the government opposes. The

21  court resolves the motion on the papers and after oral argument.

22      Resolution of the instant motion is difficult. First, it

23  turns on the restriction of federal power emanating from the

24  Commerce Clause.   The clause itself, and the jurisprudence

25  interpreting it, do not provide clear and consistent direction.

26  Moreover, the courts are divided as to the proper application of

                                 1

that jurisprudence to the instant issues. Third, to be frank, those subject to the law at issue have frequently committed the most heinous of crimes, making it difficult to give their claims the dispassionate analysis the law requires. Nonetheless, it is the sworn duty of judges to do so, and below I engage in that effort.

## I. BACKGROUND[1]

The parties represent that defendant previously has pled guilty in California's Superior Court to various charges of sexual abuse. He received a custodial sentence of twelve years. While still in prison, he signed a form entitled "Notice of Sex Offender Registration Requirement - 290 P.C.," which set forth his registration requirements under California law as a convicted sex offender. See Gov't.'s Opp'n to Def.'s Mot. to Dismiss, Ex. A. Several months later, on January 6, 2008, he was released. Although he was instructed to report to his parole officer the next day, he never did and he was found a few weeks later in Missouri. According to the government, he had not registered as a sex offender in either California or Missouri. The indictment charges that from January 6, 2008 to January 23, 2008, defendant "travel[ed] in interstate and foreign commerce" and failed to register as a sex offender and to update his registration as required by 18 U.S.C. § 2250.

---

[1]The allegations underlying the charge brought against defendant are taken from the parties briefs and are assumed true for the purposes of this motion only. Neither party has objected to the other's recitation of the facts of the case.

On November 18, 2008, defendant moved to dismiss the indictment on the grounds that 18 U.S.C. § 2250 violates the Commerce Clause, the Tenth Amendment, the Non-Delegation Doctrine, the Administrative Procedures Act and the defendant's substantive and procedural due process rights and his right to travel. Defendant also contended that venue is not proper in this court. The government opposed and a hearing was held on January 6, 2009.

## II. STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3), a defendant may move to dismiss an indictment prior to trial asserting that there is a defect in the indictment or information. The court may dismiss an indictment at any time during the pendency the case if the indictment fails to invoke the court's jurisdiction or otherwise fails to state an offense. Fed. R. Crim. P. 12(b)(3)(B). An indictment is defective if it alleges violation of an unconstitutional statute. In re. Civil Rights Cases, 109 U.S. 3, 8-9 (1883).

## III. ANALYSIS

Defendant challenges his indictment under 18 U.S.C. § 2250(a) on various Constitutional and other grounds. Because the court holds the statute fails because it does not conform to the requirement of the Commerce Clause.  It need not reach defendant's other arguments.

**A.   The Statutory Scheme**

In 1994, Congress passed the Jacob Wetterling Act as part of the Federal Violent Crime Control and Law Enforcement Act which,

among other provisions, encouraged states to create a registration program for all violent sex offenders. See 42 U.S.C. §§ 14071 et seq. In 1996, it was amended by "Megan's Law," which conditioned receipt of federal funding upon the state's compliance with the registration and community notification scheme. Id. That year, every state, the District of Columbia, and the federal government enacted some form of registration requirement. See Smith v. Doe, 538 U.S. 84, 89-90 (2003).

In 2006, Congress passed the Adam Walsh Child Protection and Safety Act, which operated to repeal the Jacob Wetterling Act and Megan's Law. Pub. L. No. 109-248 § 129, 120 Stat. 587. The Adam Walsh Act "substantially overhauled federal registration and community notification policy." Wayne A. Logan, Criminal Justice Federalism and National Sex Offender Policy, Ohio St. J. of Crim. L. 51, 74 (2008). Included among its provisions is the Sex Offender Registration and Notification Act ("SORNA"), codified at 42 U.S.C. §§ 16901 et seq. SORNA created a "comprehensive national system for the registration" of sex offenders, for the purpose of "protect[ing] the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against" listed victims. 42 U.S.C. § 16901. SORNA's requirements were broader than those of previous laws, expanding registration requirements to non-violent and juvenile sex offenders and those convicted of sexual offenses in tribal lands or foreign nations. 42 U.S.C. § 16911.

SORNA's registration requirements for sex offenders are set

4

forth in 42 U.S.C. § 16913, which provides,

> A sex offender shall register, and keep the
> registration current, in each jurisdiction where the
> offender resides, where the offender is an employee,
> and where the offender is a student. For initial
> registration purposes only, a sex offender shall also
> register in the jurisdiction in which convicted if
> such jurisdiction is different from the jurisdiction
> of residence.
> (b) Initial registration
> The sex offender shall initially register--
> (1) before completing a sentence of imprisonment with
> respect to the offense giving rise to the
> registration requirement; or
> (2) not later than 3 business days after being
> sentenced for that offense, if the sex offender is
> not sentenced to a term of imprisonment.

The sex offender must also update his registration within three

days of a change in his name, residence, employment or student

status. 42 U.S.C. § 16913(c).

SORNA's enforcement provision is codified at 18 U.S.C. §

2250, which makes failure to register a federal crime,

providing,

> (a) In general.--Whoever--
> (1) is required to register under the Sex Offender
> Registration and Notification Act;
> (2)(A) is a sex offender as defined for the purposes
> of the Sex Offender Registration and Notification Act
> by reason of a conviction under Federal law (including
> the Uniform Code of Military Justice), the law of the
> District of Columbia, Indian tribal law, or the law of
> any territory or possession of the United States; or
> (B) travels in interstate or foreign commerce, or
> enters or leaves, or resides in, Indian country; and
> (3) knowingly fails to register or update a
> registration as required by the Sex Offender
> Registration and Notification Act;
> shall be fined under this title or imprisoned not more
> than 10 years, or both.

It is this section that defendant is charged with violating.

////

**B.    The Commerce Clause**

The Constitution vests Congress with the authority to regulate "commercial intercourse" among the states. U.S. Const. art. I, § 8, cl. 3; Gibbons v. Ogden, 9 Wheat. 1, 189-190, 6 L. Ed. 23 (1824). The scope of this power has been understood by the courts differently at various times in our nation's history,[2] and presently the Commerce Clause is understood to encompass three spheres of activities that Congress can regulate. The Court in United States v. Lopez, 514 U.S. 555 (1995) explained,

> [W]e have identified three broad categories of activity that Congress may regulate under its commerce power. . . . First, Congress may regulate the use of the channels of interstate commerce. See, e.g., Darby, 312 U.S. at 114; Heart of Atlanta Motel, supra, at 256 ("'[T]he authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has frequently been sustained, and is no longer open to question.'") . . . . Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons and things in interstate commerce, even though the threat may come only from intrastate activities. See, e.g., Shreveport Rate Cases, 234 U.S. 342 (1914); Southern R. Co. v. United States, 222 U.S. 20 (1911) (upholding amendments to Safety Appliance Act as applied to vehicles used in interstate commerce); Perez, supra, at 150 ("[F]or example, the destruction of an aircraft (18 U.S.C. § 32), or . . . thefts from interstate shipments (18 U.S.C. § 659)"). Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, Jones & Laughlin

---

[2]For instance, the courts have since departed from the concepts that the Commerce Clause permits regulation of trade but not manufacturing, see, e.g., United States v. E.C. Knight Co., 156 U.S. 1 (1895), or regulation of activities that directly, rather than indirectly, affect interstate commerce. See, e.g., A.L.A Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935).

1    _Steel_, 301 U.S. at 37, _i.e._, those activities that
2    substantially affect interstate commerce, _Wirtz_,
     _supra_, at 196, n. 27.

3    514 U.S. at 558-59 (parallel citations omitted). The Court
4    subsequently has reaffirmed this conception of there being
5    three categories of activities that fall under the ambit of the
6    Commerce Clause. See _Gonzales v. Raich_, 545 U.S. 1, 16-17
7    (2005); _Pierce County, Washington v. Guillen_, 537 U.S. 129,
8    146-47 (2003); _United States v. Morrison_, 529 U.S. 598, 608-609
9    (2000).

10   The _Lopez_ Court's description of the three categories of
11   the Commerce power was based on the historical understanding of
12   Congress's authority under the Commerce Clause; the Court did
13   not perceive itself as creating new or broader bases of the
14   Commerce power. See _Morrison_, 529 U.S. at 609-610; _Lopez_, 514
15   U.S at 558-59. To understand the meaning of these categories,
16   then, it is helpful to consider the cases defining them.

17   The first category, the "channels of interstate commerce",
18   includes the regulation of the waterways and byways between the
19   states, _see_, _e.g._, _Gibbons_, 9 Wheat. at 189, as well as
20   "prohibit[ion] [of] the interstate transportation of a
21   commodity through" those channels. _Lopez_, 514 U.S. at 559. The
22   latter definition the _Lopez_ Court expanded on with reference to
23   _United States v. Darby_, 312 U.S. 100 (1941) and _Heart of_
24   _Atlanta Motel, Inc. v. United States_, 379 U.S. 241 (1964).

25   Both of those cases had held that the Commerce Clause
26   permits Congress to prohibit the interstate transport of

7

1  "noxious articles," Darby, 312 U.S. at 113, or other use of

2  interstate channels for "immoral or injurious uses." Heart of

3  Atlanta Motel, 379 U.S. at 256. Both cases based their holdings

4  on the Lottery Case, 188 U.S. 321 (1903), upholding the

5  criminalization of the interstate transport of lottery tickets,

6  and Hoke v. United States, 227 U.S. 308 (1913), upholding the

7  criminalization of transporting a woman across state lines for

8  "immoral practices" such as prostitution, among others. See

9  also Hipolite Egg Co. v. United States, 220 U.S. 45 (1911);

10  Reid v. Colorado, 187 U.S. 137 (1902).

11      In Heart of Atlanta Motel, the Court emphasized that

12  Congress's power to regulate these areas derived from their

13  commercial character and that "Congress was not restricted by

14  the fact that the particular obstruction to interstate commerce

15  with which it was dealing was also deemed a moral and social

16  wrong." 379 U.S. at 257. This echoed the Court's holding in

17  Darby, that "[t]he distinction . . . that Congressional power

18  to prohibit interstate commerce is limited to articles which in

19  themselves have some harmful or deleterious property . . . has

20  long since been abandoned." 312 U.S. at 116; see also Raich,

21  545 U.S. at 33-34 (Scalia, J., concurring) ("The first two

22  [Lopez] categories are self-evident, since they are the

23  ingredients of interstate commerce itself."); United States v.

24  Rambo, 74 F.3d 948, 951-52 (9th Cir. 1996) (upholding federal

25  criminal law of unlawful possession of a machine gun under the

26  first Lopez factor because of the interstate commercial

1   character of the market for such guns, without reference to
2   moral ill of machine guns). In other words, it was the innate
3   commercial character of the subject of the regulation, not its
4   moral effect, that gave Congress the ability to regulate it
5   under the Commerce clause.

6      The second Lopez category includes "the instrumentalities
7   of interstate commerce, or the persons or things in interstate
8   commerce." Lopez, 514 U.S. at 558. In setting forth this
9   definition, the Lopez Court cited the Shreveport Rate Cases,
10   234 U.S. 342 (1914) and Southern R. Co. v. United States, 222
11   U.S. 20 (1911), both of which involved regulations affecting
12   vehicles used in interstate commerce.[3] After Lopez, the Court
13   clarified that this prong includes not only the mechanisms of
14   interstate commerce, such as vehicles, but also the items sold
15   in interstate commerce. Reno v. Condon, 528 U.S. 141, 148-49
16   (2000) (holding that Congress could regulate the sale of
17   information gathered by state departments of motor vehicles
18   because this information has historically been sold by states
19   to a variety of industries and because it is used "for matters
20   related to interstate motoring"); see also United States v.
21   Reynard, 473 F.3d 1008, 1023 (9th Cir. 2007) (holding that
22   Congress could regulate release of DNA information because that
23   information was a "thing in interstate commerce"); United

24

25     [3]The Court also cited Perez v. United States, 402 U.S. 146,
  150 (1971) for this rule generally, although later discussed Perez
26   as implicating the third Lopez category. Lopez, 514 U.S. at 558-59.

States v. Jones, 231 F.3d 508, 514 (9th Cir. 2000) (holding that criminalization of possession of a weapon that has traveled in interstate commerce is valid under Lopez's second category).[4]

The third Lopez category includes Congress' power to regulate "those activities having a substantial relation to interstate commerce." 514 U.S. at 559. The Court observed that this has included "intrastate coal mining, intrastate extortionate credit transactions, restaurants utilizing substantial interstate supplies, inns and hotels catering to interstate guests, and production and consumption of homegrown wheat." Id. at 559-60 (citations omitted). It identified Wickard v. Filburn, 317 U.S. 111 (1942) as "perhaps the most far reaching example of Commerce Clause authority over intrastate activity," where the Court had held that an individual's cultivation of wheat for his own personal use implicated interstate commerce due to its aggregate effect on

---

[4]Other courts have viewed this category more restrictively, understanding it to encompass the instrumentalities of commerce and the things that those instrumentalities are moving. See Gibbs v. Babbitt, 214 F.3d 483, 491 (4th Cir. 2000) (although a wolf had been transported by the Fish and Wildlife Service across state lines, this did not permanently render the wolf a "thing in interstate commerce" sufficient to meet Lopez's second category); United States v. Rybar, 103 F.3d 596, 598 (7th Cir. 1996) (Alito, J., dissenting) (the second Lopez category includes the "means of conveying people and goods across state lines" and the "people and goods traveling in interstate commerce"); United States v. Patton, 451 F.3d 615, 622 (10th Cir. 2006) ("The illustrative cases for this category involve things actually being moved in interstate commerce, not all things or persons that have ever moved across state lines.").

1 | the national market. Lopez, 514 U.S. at 560.

2 |     In striking down the statute at issue in Lopez,[5] the Court

3 | held that this category had not been satisfied because the

4 | statute did not implicate "'commerce' or any sort of economic

5 | enterprise, however broadly one might define those terms," nor

6 | was it "an essential part of a larger regulation of economic

7 | activity, in which the regulatory scheme could be undercut

8 | unless the intrastate activity were regulated." Id. at 561; see

9 | also Morrison, 529 U.S. at 610-11 (where regulation has been

10 | upheld under Lopez's third category, "the activity in question

11 | has been some sort of economic endeavor"). Although

12 | Congressional findings were not necessary to uphold the

13 | constitutionality of a statute, there were no findings for that

14 | statute that would have aided the Court in determining to what

15 | extent the criminalized conduct would affect interstate

16 | commerce. Lopez, 514 U.S. at 563. The Court also observed that

17 | the statute had no express jurisdictional element limiting its

18 | application "to a discrete set of firearm possessions that

19 | additionally have an explicit connection with or effect on

20 | interstate commerce." Id. at 562. Finally, the Court rejected

21 | as too attenuated the government's argument that local crime

22 | affects interstate commerce by making the citizenry less

23 | productive. Id. at 563-65.

24 |     In Morrison, the Court struck down the civil remedies

25 |

26 |     [5]The statute in Lopez made it a federal crime to knowingly possess a firearm in a school zone.

provisions of the Violence Against Women Act as violative of the Commerce Clause, as analyzed pursuant to Lopez's third category. 529 U.S. at 613-14. Several factors led the Court to this conclusion. First, the statute addressed violent crimes against women and, as such, was not innately economic or commercial in character. Id. Second, there was no express jurisdictional element linking the statute to interstate commerce. Id. Although there were congressional findings supporting the interstate implications of violence against women, the Court found these to resemble the general "costs of crime" justification that it had rejected as inadequate in Lopez. Id. at 615. The Court cautioned that Congress's authority did not reach local policing:

> The Constitution requires a distinction between what is truly national and what is truly local. . . . The regulations and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

Id. at 617-18 (internal citations omitted).

Although some courts have had difficulty reconciling Morrison and Lopez's analysis with that of Raich, see, e.g., United States v. Maxwell, 446 F.3d 1210, 1217 n. 6 (11th Cir. 2006), the distinction seems clear. In Raich, the Court held that federal criminalization of marijuana cultivation, distribution, and possession could reach purely intrastate

12

1  activities.   545   U.S.   at   9.   Marijuana   cultivation   and

2  distribution was a "quintessentially economic" activity, unlike

3  those at issue in Lopez and Morrison, and thus Congress could

4  regulate  it  through  a  comprehensive  regulatory  scheme  that

5  included purely intrastate activities. Id. at 24-26. Like the

6  individual wheat grower in Wickard, the individual cultivating

7  marijuana  for  intrastate  use  engages  in  economic  activities

8  that could rationally be viewed as having an aggregate effect

9  on a national market and thus requiring national regulation.

10 Id. at 17-19 (citing Wickard, 317 U.S. 111); see also United

11 States v. Gomez, 87 F.3d 1093, 1096 (9th Cir. 1996) (third

12 Lopez  category  permits  Congress  to  criminalize  arson  of  an

13 apartment  building  because  the  building  is  a  commercial

14 establishment  and  as  such  has  a  substantial  effect  on

15 interstate commerce). Accordingly, this court, like the Ninth

16 Circuit, understands Raich to implicate the power of Congress

17 to  regulate  innately  economic  activity,  while  Lopez  and

18 Morrison addressed the question of how to consider regulation

19 of  non-economic  activity  in  relation  to  Congress'  Commerce

20 power. See United States v. McCalla, 545 F.3d 750, 754 (9th

21 Cir. 2008) (distinguishing Raich from Lopez and Morrison on

22 these grounds).

23 **C.   Validity  of  SORNA  and  18  U.S.C.  §  2250(a)  Under  the**

24 **Commerce Clause**

25    Given  this  analytical  framework,  it  appears  that  in

26 enacting  42  U.S.C.  §  16913  (SORNA)  and  its  enforcement

13

provision of 18 U.S.C. § 2250(a) Congress overstepped its authority under the Commerce Clause.[6]

### 1. <u>Lopez</u>'s First Category

SORNA and § 2250 cannot be sustained under <u>Lopez</u>'s first category, which permits Congress to regulate the "channels of interstate commerce." Broadly speaking, section 2250 makes an individual criminally liable for failing to register in accordance with SORNA and traveling across state lines. Plainly, it does not regulate the literal channels or other byways among the states. See <u>Gibbons</u>, 9 Wheat. at 189.

Other courts have likened SORNA, enforced through § 2250 to activity at issue in the <u>Heart of Atlanta Motel</u> and <u>Darby</u>, holding that Congress possesses the authority to regulate "immoral" or "noxious" uses of the channels of interstate commerce. See <u>United States v. May</u>, 535 F,3d 912, 921-22 (8th Cir. 2008); <u>United States v Lawrence</u>, 548 F.3d 1329, 1337 (10th Cir. 2008). Respectfully, this court must disagree with such an interpretation of the scope of Congress's authority. In <u>Darby</u> and <u>Heart of Atlanta Motel</u>, which the Court relied on in defining the first <u>Lopez</u> category, the Court made clear that it

---

[6]Other courts have analyzed only § 16913 or § 2250 or analyzed them separately. There is analytical force to the perspective that if § 16913 is unconstitutional, then § 2250 is as well, because the government cannot penalize a person for failing to comply with an unconstitutional regulation. <u>See</u>, <u>e.g.</u>, <u>United States v. Hall</u>, 577 F Supp. 2d 610, 622 (N.D.N.Y. 2008); <u>United States v. Waybright</u>, 561 F. Supp. 2d 1154, 1168 (D. Mont. 2008). Because these two statutes are so closely related, the court will consider them both together, except where there are differences material to the Commerce Clause analysis.

1   was the innately economic character of the activity being

2   regulated that gave Congress its authority to regulate or

3   criminalize it. The immoral nature of the activity being

4   regulated was not the feature that brought the activity within

5   the scope of the Commerce Clause. See Raich, 545 U.S. at 33-34

6   (Scalia, J., concurring).[7]   There he identified this first

7   category as being one of the "ingredients of interstate

8   commerce itself." Id. Thus analyzed, plainly neither § 16913

9   nor § 2250 meets Lopez's first category, as it does not

10  proscribe any sort of economic activity. A person who fails to

11  register per § 16913 or who violates § 2250 is not necessarily

12  engaged in commercial transactions or participating in a market

13  for goods or services. See Heart of Atlanta Motel, 379 U.S.

14  241; The Lottery Case, 188 U.S. 321 (1903). Even if Congress

15  viewed crossing state lines without registering under SORNA as

16  an "immoral or injurious use[]" of the channels of commerce,

17  Heart of Atlanta Motel, 379 U.S. at 256, that alone does not

18  bring the conduct under the umbrella of Lopez's first category.

19  ////

20  _____

21      [7]While not directly addressed by the Court since Lopez, it
    appears that there also is a subgroup of statutes, such as the Mann
22  Act and the Lindbergh Law, where Congress may criminalize conduct
    that possesses a direct link to the interstate travel or where the
23  travel itself is part of the harmfulness of the conduct. Even if
    statutes like these remain lawful after Lopez, neither SORNA nor
24  § 2250 can be sustained on this basis as the conduct that is
    criminalized in them is an offender's failure to register; the
25  offender's travel across jurisdictional lines is not proscribed by
    the statutes so long as the offender registers and maintains
26  updated registrations in the origin and destination jurisdictions.

### 2.   **Lopez's Second Category**

Many of the courts that have upheld SORNA or § 2250 under the Commerce Clause have done so on the grounds that it falls under Lopez's second prong. See, e.g., United States v. Shanandoah, 572 F. Supp. 2d 566 (M.D. Penn. 2008); United States v. Thomas, 534 F. Supp. 2d 912 (N.D. Iowa 2008); United States v. Senogles, 570 F. Supp. 2d 1134 (D. Minn. 2008); United States v. Mason, 510 F. Supp. 2d 923 (M.D. Fla. 2007); United States v. Gonzales, No. 5:07-cr-27-RS, 2007 WL 2298004 (N.D. Fla. Aug. 9, 2007); United States v. Gould, 526 F. Supp. 2d 538 (D. Md. 2007). Again, this court cannot agree.

Lopez's second prong includes the things and persons that move in interstate commerce. The Ninth Circuit interprets this fairly broadly, to permit regulation of a good that at one time in the past has passed through interstate commerce. Jones, 231 F.3d at 514. Accordingly, so the reasoning of other courts goes, once a sex offender passes across state lines, he may be prosecuted for his later failure to register per SORNA's requirements.

This interpretation of the Commerce power as expressed in Lopez's second category appears insupportably broad. Like Lopez's first prong, the second prong encompasses innately economic goods and activities or, in other words, those goods and activities that move within a national market. These have been the only types of regulations upheld by the Supreme Court or Ninth Circuit upon invocation of the language of the second

16

category. See, e.g., Raich, 545 U.S. at 17-18 (citing Perez v. United States, 402 U.S. 146, 150 (1971)); Lopez, 514 U.S. at 558 (collecting cases); Reynard, 473 F.3d at 1023; Jones, 231 F.3d at 514. As one court observed, "[T]he text of Lopez . . . could never mean that once a person has traveled across state lines Congress is free to attach any regulation to him it deems fit. Such a reading would mean Congress has greater power under the second Lopez category than it does under the third." United States v. Myers, No. 08-60064, 2008 WL 5156671 at *33 (S.D. Fla. Dec. 9, 2008). Such an interpretation flies in the face of the High Court's recent holdings and ignores the principle that has always guided the Court's understanding of the Commerce Clause, which is the textual limitation that the Commerce power extends, in some way or another, to commerce.

Consequently, § 2250 and § 16913 cannot be valid under Lopez's second category. The sex offenders who are implicated by these statutes have had no necessary relationship to economic activities. They are not a good that is a part of a national market. They are not engaged in transactions within a national market. Put plainly, nothing about them or the conduct proscribed by the statutes is innately economic and, hence, the statute cannot be sustained under Lopez's second category.

### 3.   **Lopez's Third Category**

Many of the courts that have found SORNA or § 2250 a valid exercise of the Commerce power have done so under Lopez's third category. See, e.g., United States v. Howell, No. 08-2126, 2009

17

WL 66068 (8th Cir. Jan. 13, 2009); Shanandoah, 572 F. Supp. 2d at 577-58 (collecting cases). This category does appear to hold the most promise, as it permits Congress to regulate non-economic activity under the Commerce Clause. A careful consideration of the limits of this category, however, lead the court to conclude that § 16913 and § 2250 are outside of it.

### a.   Whether the Statutes Regulate Economic Activity

First, Lopez, Morrison, and Raich identified that the third category includes intrastate economic activity that aggregates to effect a national economic market. See Raich, 545 U.S. at 17; Morrison, 529 U.S. at 610; Lopez, 514 U.S. at 560-61. Wickard typifies this. See Raich, 545 U.S. at 17-19; Lopez, 514 U.S at 560. Here, as was true of the statutes at issue in Lopez and Morrison, neither § 2250 nor § 16913 address an economic activity that could affect the supply or demand of or ability to regulate a good in the national market. The fact that the conduct regulated is not innately economic militates against finding that it is encompassed by the Commerce power. See Morrison, 529 U.S. at 610-11 (explaining that "the noneconomic, criminal nature of the conduct at issue was central to [the Court's] decision in" Lopez).

### b.   Presence of a Jurisdictional Element

Second, the Lopez Court considered whether there was an "express jurisdictional element which might limit [the statute's] reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on

interstate commerce." 514 U.S. at 562. The absence of such an element in the statutes at issue in Lopez and Morrison led the Court to conclude that those statutes were not valid exercises of the Commerce power. Morrison, 529 U.S. at 613; Lopez, 514 U.S. at 561. Here, there similarly is no express jurisdictional element in § 16913, which thus requires a finding that it is not valid under the Commerce Clause.

In contrast, § 2250 does possess a purportedly jurisdictional element, as it penalizes a person who is required to register under SORNA and knowingly fails to do so or to update his or her registration and who travels in interstate commerce. In this way, unlike the statutes considered in Lopez and Morrison, the section limits the class of those who can be penalized to only those who have traveled in interstate commerce. The problem, however, is that this jurisdictional hook still creates a class that is too broad for Commerce Clause purposes.

Under the statute, a person may be prosecuted for failing to register in his home state, then crossing state lines and registering in the next state.[8] The harm, therefore, may be entirely intrastate. Were this a sufficient jurisdictional element, there would be no limit to Congress's ability to penalize any crime whatsoever, so long as the defendant at some

---

[8]Indeed, that resembles the defendant's circumstance here, as he was incarcerated in California, failed to register upon his release, and then traveled to Missouri. He was subsequently prosecuted under § 2250 in this district.

point in the course of his life traveled across state lines.
This appears to be a plain usurpation of the state's police
power; as the Court expressed in <u>Morrison</u>, there is "no better
example of the police power, which the Founders denied the
National Government and reposed in the States, than the
suppression of violent crime and vindication of its victims."
529 U.S. at 618. As such, the jurisdictional language in § 2250
cannot alone render the statute valid under the Commerce
Clause.

### c. Existence of Congressional Findings Identifying the Nexus to Interstate Commerce

Next, the court considers whether there were Congressional
findings explaining the link between the activity the statute
regulates and interstate commerce. While Congress' findings are
not dispositive, they may be helpful. <u>Morrison</u>, 529 U.S. at
614. There were no express Congressional findings for either §
16913 or § 2250 describing how sex offender registration
affected interstate commerce nor any discussion by members of
Congress, of which the court is aware, identifying that nexus.[9]
<u>See</u> H.R. Rep. No. 109-128; 152 Cong. Rec. S8012-02 (July 20,

---

[9]In enacting the Adam Walsh Act, Congress did identify that
child pornography, which is criminalized in the Act, related to
interstate commerce. Pub. L. 109-248, § 501(D). These findings do
not create a constitutional justification for SORNA or its
enforcement through § 2250, despite these sections having been
passed as part of the Adam Walsh Act. <u>Cf.</u> <u>Morrison</u>, 529 U.S. at
612-14 (considering only the legislative findings of the civil
remedies provision of VAWA, not those relating to its other
sections).

2006).

        **d.**     **Whether the Statutes Exist in a Broader Regulatory Scheme That Itself Implicates Interstate Commerce**

Finally, regulation of a purely non-economic activity can be sustained under the Commerce Clause if that activity exists within a national regulatory scheme that affects interstate commerce. This court's view is that this analysis is not necessary, as an activity that is not economic under any of the other aspects of the Lopez analysis cannot be valid under the Commerce Clause simply because it may aggregate to effect interstate commerce. Although other courts analyzing SORNA have approached it in this manner, it seems that the High Court could not have been more direct when stating, "We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." Morrison, 529 U.S. at 617.

Many other courts that have upheld § 2250 or § 16913 under this Lopez category have done so based on the conclusion that those statutes regulate intrastate conduct that has an effect on interstate commerce. See, e.g., Howell, 2009 WL 66068 at *11-14; United States v. Madera, 474 F. Supp. 2d 1257 (M.D. Fla. 2007); United States v. Hinen, 487 F. Supp. 2d 747, 757 (W.D. Va. 2007). As explained above, this seems to misapprehend the Commerce Clause jurisprudence, as the cases defining this

1  aspect of the Commerce power, particularly <u>Wickard</u> and <u>Raich</u>,

2  dealt with intrastate regulation of economic commodities that

3  exist as part of a national market. The principle deriving from

4  those cases is minimally instructive when noneconomic activity

5  is at issue.

6      Courts upholding SORNA and § 2250 have also relied on

7  Justice Scalia's concurrence in <u>Raich</u>, in which he opined that

8  Congress may, through both its Commerce power and authority

9  under the Necessary and Proper Clause, regulate noneconomic

10  activity that in aggregate substantially affects interstate

11  commerce. <u>Raich</u>, 545 U.S at 33-35 (Scalia, J., concurring).

12  This line of reasoning appears unpersuasive for several

13  reasons. First, Justice Scalia's observations were included in

14  a concurrence on a case in which the activity at issue was

15  economic, so his statement is simply dicta. Second, his

16  observation cited as authority <u>Lopez</u>, 514 U.S. at 561. That

17  passage of <u>Lopez</u>, however, holds,

18          Section 922(q) is a criminal statute that by its terms
            has nothing to do with "commerce" or any sort of
19          economic enterprise, however broadly one might define
            those terms. Section 922(q) is not an essential part
20          of a larger regulation of economic activity, in which
            the regulatory scheme could be undercut unless the
21          intrastate activity were regulated. It cannot,
            therefore, be sustained under our cases upholding
22          regulations of activities *that arise out of or are
            connected with a commercial transaction*, which viewed
23          in the aggregate, substantially affects interstate
            commerce.
24
   <u>Lopez</u>, 514 U.S. at 561 (emphasis added). It is apparent that
25
   the <u>Lopez</u> Court did not hold that noneconomic, intrastate
26

                                    22

activities may be regulated when they aggregate to affect interstate commerce. Finally, to the extent that Justice Scalia's conclusion contradicts the express holding of the majority in <u>Morrison</u>, this court is obligated to follow the latter.

Nevertheless, in an abundance of caution, the court considers whether there is a basis to believe that SORNA or § 2250 regulate intrastate activities that aggregate to affect interstate commerce or exist within a regulatory scheme that implicates interstate commerce. The court concludes that they do not. Neither SORNA nor the Adam Walsh Act, of which it is a part, are economic regulatory schemes. Although SORNA provides for the accumulation of sex offender information into a national database, there is nothing to indicate that there is a national market for such information that Congress was seeking through SORNA to regulate. Indeed, the express purpose of SORNA is "to protect the public from sex offenders and offenders against children." 42 U.S.C. § 16901. The Congressional record is replete with discussion of the importance of SORNA in creating uniformity among the state's registration requirements and the perceived problem of offenders failing to register after relocating to a new jurisdiction. <u>See generally</u> 152 Cong. Rec. S8012-02 (July 20, 2006). There is no indication, however, that uniformity in registration requirements or federalizing the crime of failing to register in any way implicates a national commercial market.

The link to a regulatory scheme is even more attenuated for § 2250, as a defendant's failure to register in one jurisdiction seems to relate only minimally, if at all, to disparate reporting requirements among the states or any other national regulatory scheme.

Finally, although the Adam Walsh Act contains components that arguably implicate economic goods, such as its restrictions on child pornography or use of the Internet to facilitate sexual misconduct, this alone do not render the entire Act economic in nature. As explained above, whether an Act as a whole possesses economic aspects does not suffice to render all of its provisions valid under the Commerce Clause. See Morrison, 529 U.S. at 611-15 (analyzing the provision of VAWA at issue, not VAWA as a whole).

Consequently, the court holds that neither 42 U.S.C. § 16913 nor 18 U.S.C. § 2250(a) are valid exercises of Congressional authority under the Commerce Clause. As such, the court need not reach defendant's other challenges to the indictment.

## IV. CONCLUSION

Defendant's motion to dismiss the indictment is GRANTED.

IT IS SO ORDERED.

DATED: February 9, 2009.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26